UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
ESTATE OF JAMES KNAUST by A. ELIZABETH
KNAUST, ELIZABETH KNAUST, ANTHONY
IUZZOLINO, and THERESE IUZZOLINO,

                    Plaintiffs,

                                              MEMORANDUM & ORDER
          -against-                           14-CV-2496(JS)(ARL)

ERIK CONTRERAS, individually and as
New York City Police Officer,
NEW YORK CITY POLICE DEPARTMENT,
CITY OF NEW YORK, HESS EXPRESS
No. 32550 doing business as Hess
Gas Station, and GERALD PRIOLEAU,

                    Defendants.
-------------------------------------X
APPEARANCES
For Plaintiffs:          Julio C. Galarza, Esq.
                         Galarza Law Office
                         5020 Sunrise Highway, 2nd Floor
                         Massapequa Park, NY 11762

For Defendants:
Erik Contreras,
NYPD, City of N.Y.       Brian Jeremy Farrar, Esq.
                         Tobias Eli Zimmerman, Esq.
                         New York City Law Department
                         100 Church Street
                         New York, NY 10007

Hess Express             Brian J. Donnelly, Esq.
                         Daniel I. Winter, Esq.
                         Ahmuty, Demers & McManus
                         199 Water Street, 16th Floor
                         New York, NY 10038

SEYBERT, District Judge:

          Plaintiffs  Estate  of  James  Knaust  by  A.  Elizabeth

Knaust, Elizabeth Knaust, Anthony Iuzzolino, and Therese Iuzzolino

(collectively, "Plaintiffs") commenced this action against Erik

Contreras ("Contreras"), the New York City Police Department ("NYPD"), and the City of New York (collectively, the "City Defendants") and Hess Express doing business as Hess Gas Station ("Hess"),[1] asserting claims pursuant to 42 U.S.C. § 1983 and claims for false arrest, malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, negligence, loss of society, and wrongful death. Presently pending before the Court are Hess' motion for summary judgment, and the City Defendants' motion for summary judgment. (See Docket Entries 49 and 54.) For the following reasons, Hess' motion is GRANTED IN PART and DENIED IN PART, and the City Defendants' motion is GRANTED.

BACKGROUND[2]

On November 1, 2012, Anthony Iuzzolino ("Iuzzolino") and James Knaust ("Knaust") went to purchase gasoline at a Hess station located in Massapequa, NY (the "Hess Station"). (City Defs.' 56.1

---

[1] Plaintiffs also asserted claims against the Nassau County Police Department and a number of Nassau County Police Officers. However, those claims have been voluntarily dismissed. (See Stip. of Dismissal, Docket Entry 64.)

[2] The following facts are drawn from the City Defendant's Rule 56.1 Statement (City Defs.' 56.1 Stmt., Docket Entry 55), Hess' Rule 56.1 Statement (Hess' 56.1 Stmt., Docket Entry 51), Plaintiffs' Revised 56.1 Counterstatement with respect to the City Defendants' Rule 56.1 Statement (Pls.' City Defs.' 56.1 Counterstmt., Docket Entry 63), and Plaintiffs' Revised 56.1 Counterstatement with respect to Hess' Rule 56.1 Statement (Pls.' Hess 56.1 Counterstmt., Docket Entry 62). All factual disputes have been noted and all internal quotation marks and citations have been omitted.

Stmt. ¶ 1.) Due to Superstorm Sandy, the line at the Hess Station was approximately one half-mile long. (Hess' 56.1 Stmt. ¶ 4.) Erik Contreras ("Contreras"), an off-duty police officer with the New York City Police Department ("NYPD"), was pumping gasoline at the Hess Station while Iuzzolino and Knaust waited in line. (City Defs.' 56.1 Stmt. ¶¶ 3-5.)

Iuzzolino and Knaust waited on line for approximately two hours. (Hess' 56.1 Stmt. ¶ 5.) When Iuzzolino and Knaust reached the gas pumps, Gerald Prioleau ("Prioleau") entered the Hess Station on foot with an empty gas can. (City Defs.' 56.1 Stmt. ¶ 6.) Iuzzolino observed Prioleau, an African-American male, speak with the woman in front of him on line and then speak with the Hess Station cashier; Prioleau made two trips between the woman and the cashier before the woman finished pumping gas. (Hess' 56.1 Stmt. ¶¶ 7-9.) Prioleau attempted to pump gas before Iuzzolino started to pump, (Hess' 56.1 Stmt. ¶ 12), and Iuzzolino said to Prioleau, "[i]f you touch that pump we are going to have a problem," (City Defs.' 56.1 Stmt. ¶ 8). A physical altercation ensued; however, the parties dispute whether Knaust was involved. (City Defs.' 56.1 Stmt. ¶ 9; Pls.' City Defs.' 56.1 Counterstmt. ¶ 9; Hess' 56.1 Stmt. ¶ 14.)[3]

_____

[3] Plaintiffs allege that Iuzzolino was facing the pump when Prioleau placed him in a headlock, and straddled him and hit him in the face, chest, and neck when he fell to the ground. (Pls.' City Defs.' 56.1 Counterstmt. ¶ 9.) Plaintiffs further allege

The parties dispute how the altercation concluded. The City Defendants allege that "Contreras intervened and broke up the altercation." (City Defs.' 56.1 Stmt. ¶ 10.) Hess alleges that "[o]ther patrons in the gas station attempted to break up the fight, which lasted approximately 30 seconds." (Hess 56.1 Stmt. ¶ 16.) Plaintiffs allege that Contreras identified himself as an off-duty NYPD officer and Knaust and Iuzzolino listened to Contreras' verbal direction to stop fighting. (Pls.' City Defs.' 56.1 Counterstmt. ¶ 10.) Plaintiffs contend that Prioleau tried to get away from Contreras and kicked and punched Contreras, and Contreras struck Prioleau in the head and face to try and restrain him. (Pls.' City Defs.' 56.1 Counterstmt. ¶ 10.)

Contreras called 911 to report the incident and request assistance from the Nassau County Police Department ("NCPD"). (City Defs.' 56.1 Stmt. ¶ 12.) Plaintiffs allege that Contreras told the 911 operator that "the person he was holding [Prioleau] tried to assault him and that that person tried to assault another person before assaulting him." (Pls.' City Defs.' 56.1 Stmt. ¶ 11.) Plaintiffs also allege that Contreras told the 911 operator that "[Prioleau] attacked Contreras when Contreras tried to stop him [Prioleau]; Contreras had Prioleau on the ground restrained

_____

that Iuzzolino did not hit Prioleau, and Iuzzolino sustained injuries to his face, lip, elbow, and knees. (Pls.' City Defs.' 56.1 Counterstmt. ¶ 9.)

because Prioleau tried to get away." (Pls.' City Defs.' 56.1 Stmt. ¶ 11.)  Following the incident, Iuzzolino continued pumping gas into four gas cans.  (Hess 56.1 Stmt. ¶ 18.)

I.  The County Investigation

NCPD arrived at the Hess Station within five minutes of the altercation.  (Hess 56.1 Stmt. ¶ 18.)  Plaintiffs allege that the responding officers observed Contreras holding Prioleau on the ground when they arrived.  (Pls.' City Defs. 56.1 Stmt. ¶ 13.) Plaintiffs note that Contreras' statement to the police (the "32B Statement") indicates that Contreras talked to Knaust, Iuzzolino, and Prioleau and got them to stop fighting, but does not state that Contreras had to restrain Prioleau or that Prioleau kicked and punched Contreras to get away.  (Pls.' City Defs.' 56.1 Stmt. ¶ 13.)  The responding officers noted that Prioleau was bleeding and had sustained visible injuries to his face.  (City Defs.' 56.1 Stmt. ¶ 15.)  Plaintiffs note that Contreras also had blood on him.  (Pls.' City Defs. 56.1 Stmt. ¶ 13.)

Prioleau advised the responding officers that a pregnant woman gave him permission to use the pump, but Iuzzolino stepped in between him and the pump and told him "[i]f you touch this pump, we will have a problem."  (City Defs.' 56.1 Stmt. ¶ 16.)  Plaintiffs allege that the officers did not take a statement from the pregnant woman, or obtain her name and contact information.  (Pls.' City Defs.' 56.1 Stmt. ¶ 16.)  Prioleau also told police that after he

tried to use the pump, "Iuzzolino and Knaust knocked him to the ground and slammed his head into the cement multiple times, causing lacerations, swelling and pain." (City Defs.' 56.1 Stmt. ¶ 17.) The City Defendants allege that the pregnant woman provided a statement to NCPD Officer Beyerlein that is consistent with Prioleau's written account and Contreras' testimony. (City Defs.' 56.1 Stmt. ¶ 18.) Plaintiffs dispute that allegation. (Pls.' City Defs.' 56.1 Stmt. ¶ 18.) The City Defendants also allege that other witnesses aside from Prioleau, Contreras, and the pregnant woman told NCPD officers that Iuzozlino and Knaust attacked Prioleau. (City Defs.' 56.1 Stmt. ¶ 19.) Plaintiffs similarly dispute that allegation. (Pls.' City Defs.' 56.1 Stmt. ¶ 19.)

Prioleau advised Officer Beyerlein that he wanted to press charges against Iuzzolino and Knaust. (City Defs.' 56.1 Stmt. ¶ 20.) Iuzzolino and Knaust were arrested; however, Contreras did not participate in the arrest and played no role in their prosecution. (City Defs.' 56.1 Stmt. ¶¶ 21-22.) Plaintiffs allege that Contreras' "false statements" led to their arrest. (Pls.' City Defs.' 56.1 Stmt. ¶ 22.) Iuzzolino did not receive medical treatment while he was in custody and while he saw a doctor a "couple days" after the incident, he did not receive treatment or medication. (Hess' 56.1 Stmt. ¶ 22.)

## II. The Hess Station Cashier

Hess alleges that prior to the subject incident, the line for gas at the Hess Station was "moving in an orderly fashion." (Hess' 56.1 Stmt. ¶ 23.) Mirza Baig ("Baig"), a sales associate, was working at the Hess Station on the day of the incident. (Hess' 56.1 Stmt. ¶¶ 25-26.) Baig testified that a tall, African-American male later identified as Prioleau approached the booth and asked for one gallon of gas because his car was stuck. (Hess' 56.1 Stmt. ¶ 28.) Hess alleges that Baig told Prioleau that "there was a long line and that he could not give him gas" and "advised Prioleau that he could ask someone at the pumps to see if they would let him pump gas." (Hess' 56.1 Stmt. ¶ 29.) Plaintiffs allege that Prioleau gave Baig twenty dollars for one gallon of gas. (Pls.' Hess 56.1 Counterstmt. ¶ 29.) However, Hess alleges that Baig testified that he did not accept money from Prioleau. (Hess' 56.1 Stmt. ¶ 31.)

Baig observed Prioleau speaking with someone at the pump but "did not see what happened due to the other people on line." (Hess' 56.1 Stmt. ¶ 30.) Baig observed an off-duty police officer holding another man down. (Hess' 56.1 Stmt. ¶ 32.) The parties dispute whether Baig spoke to any police officers on the date of the incident. (Hess' 56.1 Stmt. ¶ 34; Pls.' Hess 56.1 Counterstmt. ¶ 34.) No other altercations occurred while Baig was on duty that day; however, Plaintiffs allege that the subject incident was not

the only one that occurred on November 1, 2012. (Hess' 56.1 Stmt. ¶ 35; Pls.' Hess 56.1 Counterstmt. ¶ 35.)

III. <u>The City Defendants' Motion</u>

On October 14, 2016, the City Defendants filed their motion for summary judgment. (<u>See</u> <u>generally</u> City Defs.' Mot., Docket Entry 54.) The City Defendants argue that NYPD is not a suable entity and Plaintiffs have not established a claim for municipal liability against the City of New York (the "City"). (City Defs.' Br., Docket Entry 57, at 8-10.) They further contend that Plaintiffs failed to comply with New York General Municipal Law's notice of claim provisions with respect to any state law claims against the City. (City Defs.' Br. at 25-26.)

The City Defendants also argue that Plaintiffs cannot establish a Section 1983 claim against Contreras. (City Defs.' Br. at 9-26.) The City Defendants argue that Contreras was not personally involved in a constitutional violation, as there is no evidence that Contreras acted with intent to deprive Iuzzolino and Knaust of their constitutional rights. (City Defs.' Br. at 10-12.) The City Defendants also allege that while Plaintiffs characterize Contreras' 32B Statement as false, it is, at best, incomplete, and Plaintiffs cannot establish that the 32B Statement was intentionally incomplete or that Contreras instigated Plaintiffs' arrests. (City Defs.' Br. at 12-14.) Additionally, the City Defendants argue that the NCPD officers had an independent

basis for probable cause that "breaks the chain of causation between Plaintiffs' arrests and any false statement given by Contreras, insulating him from liability." (City Defs.' Br. at 13-14.)

The City Defendants further aver that Plaintiffs have not demonstrated any violations of their First, Fourth, Fifth, Sixth, or Fourteenth Amendment rights. (City Defs.' Br. at 15-23.) In particular, the City Defendants argue that Plaintiffs have failed to establish a Fourth Amendment violation, as Iuzzolino and Knaust were not stopped, detained, or searched prior to being arrested; NCPD had probable cause to arrest Iuzzolino and Knaust; and Contreras was not involved in Iuzzolino and Knaust's criminal prosecution. (City Defs.' Br. at 15-19.) The City Defendants also allege that Elizabeth Knaust and Therese Iuzzolino cannot assert a familial association claim since that claim is not available for "emotional distress, loss of society, loss of services, or any other consequent collateral injuries allegedly suffered personally by a victim's family members." (City Defs.' Br. at 22-23 (internal quotation marks and citation omitted).) Finally, the City Defendants argue that Contreras is entitled to qualified immunity. (City Defs.' Br. at 23-25.)

Plaintiffs oppose the City Defendants' motion and allege that Contreras was acting under color of state law. (Pls.' City Defs.' Opp. Br., Docket Entry 60, at 10-12.) Plaintiffs argue

that Contreras' failure to provide NCPD with all information was "egregious" and "[i]n so doing, Contreras willingly and purposely--though impermissibly--implicated Plaintiffs as the aggressors despite compelling evidence to the contrary." (Pls.' City Defs.' Opp. Br. at 11-12.)

In reply, the City Defendants argue that Plaintiffs' claims against Contreras under the First, Fifth, and Sixth Amendments, and the Fourteenth Amendment Due Process and Equal Protection clauses should be deemed abandoned based on their failure to respond to the City Defendants' arguments. (City Defs.' Reply, Docket Entry 67, at 2-3.) The City Defendants also argue that Plaintiffs' state law claims against the City should similarly be deemed abandoned. (City Defs.' Reply at 2-3.)

IV. <u>Hess' Motion</u>

Hess moves for summary judgment and argues that the Complaint should be construed as only asserting state law claims against Hess--particularly, claims for negligence and negligent infliction of emotional distress.[4] (Hess' Br. at 5-8.) Hess argues that it did not have a duty to protect Knaust and Iuzzolino from a "spontaneous physical altercation," and Plaintiffs caused the subject incident by "aggressively attempting to prevent a third

---

[4] While Hess refers to itself as "Speedway," for ease of reference the Court will continue to refer to this defendant as Hess. (Hess' Br., Docket Entry 52, at 5.)

party from obtaining gas before them." (Hess' Br. at 10, 12.) Hess also argues that Plaintiffs have not alleged conduct sufficiently outrageous to state a claim for intentional or negligent infliction of emotional distress. (Hess' Br. at 14-15.) Finally, Hess alleges that Plaintiffs have not established punitive damages, and their claim for the wrongful death of James Knaust[5] has no merit in light of the absence of any evidence that Knaust complained of mental issues related to the subject incident. (Hess' Br. at 17.)

Plaintiffs argue that Hess owed a duty to the public as a landowner and breached its duty to Plaintiffs to the extent that Baig "negligently advised Prioleau that he could approach someone currently pumping gas, having waited on line themselves, and attempt to secure their permission to essentially cut all remaining customers in line," and accepted the "exorbitant" amount of twenty dollars for one gallon of gas. (Pls.' Hess Opp. Br. at 9-11.) Plaintiffs allege that there are issues of fact as to proximate cause that preclude the award of summary judgment. (Pls.' Hess Opp. Br. at 12-13.) Plaintiffs also argue that their negligent infliction of emotional distress claim has merit. (Pls.' Hess Opp. Br. at 13.) Plaintiffs aver that Baig's conduct "exceeded the bounds of decency and was patently outrageous under the

_____

[5] Hess alleges that Knaust died of a drug overdose on April 4, 2014. (Hess' Br. at 17.)

exceptional and emotionally turbulent circumstances following
Superstorm Sandy," and Knaust and Iuzzolino "rightfully fear[ed]
for their safety."  (Pls.' Hess Opp. Br. at 13.)

In reply, Hess argues that it had no duty to protect its
patrons from "unforeseeable and unexpected assaults."  (Hess'
Reply Br., Docket Entry 66, at 2.)  Hess also contends that Baig
denied accepting money from Prioleau, and "[t]he only mentions of
such an exchange are contained in inadmissible hearsay testimony
of police officers, none of whom directly observed the events in
question, while the non-hearsay testimony provides no indication
of any transaction."  (Hess' Reply Br. at 5.)

## DISCUSSION

Summary judgment will be granted where the movant
demonstrates that there is "no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed 2d 202 (1986).  In
determining whether an award of summary judgment is appropriate,
the Court considers the pleadings, deposition testimony,
interrogatory responses, and admissions on file, together with
other firsthand information that includes but is not limited to

affidavits.  Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011); see
also FED. R. CIV. P. 56(c).

The movant bears the burden of establishing that there
are no genuine issues of material fact.  Gallo v. Prudential
Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once
the movant makes such a showing, the non-movant must proffer
specific facts demonstrating "a genuine issue for trial."  Giglio
v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at
*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation
omitted).  Conclusory allegations or denials will not defeat
summary judgment.  Williams v. Smith, 781 F.2d 319, 323 (2d Cir.
1986).  See also Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.
1991) (a motion for summary judgment will not be defeated based
"merely upon a 'metaphysical doubt concerning the facts' or on the
basis of conjecture") (internal citations omitted).  However, in
reviewing the summary judgment record, "'the court is required to
resolve all ambiguities and draw all permissible factual
inferences in favor of the party against whom summary judgment is
sought.'"  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech.
Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23,
2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.
1997)).

At the outset, the Court notes that the Complaint
contains the following claims, without specification as to which

Defendants each claim is asserted against: (1) Section 1983 claim alleging violations of the Fourth and Fourteenth Amendment right "to be free from unreasonable searches and seizures, false arrest and malicious prosecution," (2) Section 1983 claim alleging violations of the due process clause of the Fourteenth Amendment, (3) Section 1983 claim for interference with family relationships in violation of the First and Fourteenth Amendments, (4) false arrest and malicious prosecution, (5) intentional, reckless or negligent infliction of emotional distress, (6) negligence, (7) loss of society, and (8) wrongful death. (See generally Compl.) The Court construes the Complaint as asserting all of these claims against the City Defendants, and only the claims for intentional, reckless or negligent infliction of emotional distress, negligence, loss of society, and wrongful death against Hess.

However, "[b]ecause the NYPD is an administrative arm of the City of New York, a municipality, the NYPD does not have a separate legal identity and therefore does not have the capacity to be sued." Santiago v. City of N.Y., No. 06-CV-1550, 2008 WL 2854261, at *3 (S.D.N.Y. Jul. 21, 2008). Accordingly, all claims against NYPD are DISMISSED and the Clerk of the Court is directed to TERMINATE NYPD as a defendant in this action.

Additionally, the Court concurs with the City Defendants that Plaintiffs have abandoned a number of their claims. Particularly, Plaintiffs have failed to respond to Defendants'

14

arguments regarding their Section 1983 claims asserting violations
of the Fourteenth Amendment due process clause and their Section
1983 claim for interference with family relationships in violation
of the First and Fourteenth Amendments.[6]  (City Defs.' Reply Br.
at 2-3.)   Plaintiffs also have not responded to the City
Defendants' arguments that: (1) with the exception of the malicious
prosecution claim, their state law claims against the City and
Contreras are defective based on Plaintiffs' failure to timely
file a Notice of Claim, (2) the malicious prosecution claim fails
as it is undisputed that Contreras did not play any role in the
criminal prosecution against Knaust and Iuzzolino, and (3)
Plaintiffs have failed to state a Section 1983 claim against the
City based on the absence of any evidence of a policy or custom.
(City Defs.' Br. at 25-26.)   Indeed, Plaintiffs have withdrawn
"all federal constitutional claims with prejudice" against the
City.  (See Pls.' City Defs.' Opp. Br. at 13.)   Plaintiffs have
also characterized their second state law claim as one for

---

[6] To the extent Plaintiffs' first Section 1983 claim--which
addresses alleged violations of their Fourth and Fourteenth
Amendment right to be free from searches and seizures, false
arrest, and malicious prosecution, (Compl. ¶ 56)--also
references the First, Fifth, and Sixth Amendments, as well as
the Due Process and Equal Protection Clauses of the Fourteenth
Amendment, (see Compl. ¶ 67), Plaintiffs similarly fail to
address Defendants' arguments as to any Section 1983 claim based
on violations of the First, Fifth, or Sixth Amendments, (City
Defs.' Br. at 20), or the Due Process or Equal Protection
Clauses, (City Defs.' Br. at 22-23).

negligent infliction of emotional distress, (see Pls.' Hess Opp. Br. at 13), and failed to address any claim for intentional infliction of emotional distress, wrongful death, or loss of society. Accordingly, the Court DISMISSES these claims as abandoned. See Elmessaoudi v. Mark 2 Restaurant LLC, No. 14-CV-4560, 2016 WL 4992582, at *15 (S.D.N.Y. Sept. 15, 2016)("[f]ederal courts have the discretion to deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way") (internal quotation marks and citation omitted).

Thus, Plaintiffs' remaining claim are: (1) a Section 1983 claim against Contreras based violations of their Fourth and Fourteenth Amendment rights "to be free from unreasonable searches and seizures, false arrest and malicious prosecution," (see Compl. ¶¶ 56-70), and (2) state law claims for negligence and negligent infliction of emotional distress against Hess, (see Compl. ¶¶ 87-91).

I. City Defendants' Motion

To state a claim pursuant to Section 1983, "a plaintiff must establish that the defendant deprived him of a federal or constitutional right while acting under the color of state law." Cox v. Warwick Valley Ctr. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011). For purposes of this motion, the City Defendants do not dispute that Contreras acted under color of state law. (City

Defs.' Br. at 9, n.11.) Additionally, while the Complaint references alleged violations of the right "to be free of unreasonable searches and seizures, false arrest, and malicious prosecution," (Compl. ¶ 56), it is undisputed that Contreras was not involved in the prosecution of Iuzzolino and Knaust, and Plaintiffs have not alleged that they were searched by Contreras. Thus, the Court construes the Complaint as asserting a Section 1983 claim against Contreras based on false arrest.

"Claims for false arrest, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizure, are substantially the same as claims for false arrest under New York state law." McNamara v. City of N.Y., No. 06-CV-5585, 2009 WL 735135, at *4 (S.D.N.Y. Mar. 20, 2009) (internal quotation marks and citation omitted). To state a claim for false arrest under New York law, the plaintiff must establish: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" Weintraub v. Bd. of Educ. of City of N.Y., 423 F. Supp. 2d 38, 53 (E.D.N.Y. 2006), on reconsideration in part, 489 F. Supp. 2d 209 (E.D.N.Y. 2007), aff'd sub. nom. Weintraub v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y., 593 F.3d 196 (2d Cir. 2010) (quoting Singer v. Fulton

17

Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995); alteration in original).

Here, it is undisputed that Contreras did not arrest Iuzzolino and Knaust.  However, "a claim of false arrest or false imprisonment may lie where a plaintiff can show that . . . defendants instigated his arrest, thereby making the police . . . agents in accomplishing their intent to confine the plaintiff." Weintraub, 423 F. Supp. 2d at 56 (internal quotation marks and citations omitted; alterations in original).  See also Paul v. Bank of Am. Corp., No. 09-CV-1932, 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011) ("a defendant is liable for false arrest if, with the intent to have the plaintiff arrested, he makes false statements to the police and instigates an arrest" (citing Weintraub, 423 F. Supp. 2d at 56)).  Conversely, "[i]f a defendant erroneously reports a suspected crime, but in no other way instigates the arrest, he is not liable for false imprisonment." Paul, 2011 WL 684083, at *6.  "[W]hether a defendant's conduct rises to the level of instigating is a question of fact." Paul, 2011 WL 684083, at *7.

The Second Circuit has held, in the context of a case involving a civilian defendant, that liability for false arrest only attaches where the defendant "affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue

zeal to the point where the officer is not acting of his own volition." <u>Vlach v. Staiano</u>, 604 F. App'x 77, 78 (2d Cir. 2015) (summary order; internal quotation marks and citation omitted).

The Court finds that no reasonable juror could find that Contreras instigated Iuzzolino and Knaust's arrest. The record does not indicate that Contreras was actively involved in the arrest, as his involvement in the incident was limited to calling 911, speaking with Officer Quinn of the NCPD, and providing the 32B Statement. (<u>See</u> Contreras' 32B Stmt., City Defs.' Mot. Ex. C, Docket Entry 56-3.) Plaintiffs have not alleged that Contreras requested that anyone be arrested. In fact, Prioleau signed a supporting deposition in which he stated that he was "jumped" by Iuzzolino and Knaust and requested that they be arrested. (Prioleau's 32B Stmt., City Defs.' Mot. Ex. B, Docket Entry 56-2.)

This case stands in stark contrast to the facts in <u>McNamara</u>, where the Court denied summary judgment with respect to the plaintiff's Section 1983 false arrest claim based on an off-duty police detective's alleged instigation of his arrest. <u>McNamara</u>, 2009 WL 735135, at *4. In that case, the plaintiff had an altercation with the off-duty police detective in which the detective kicked the plaintiff in the groin, the plaintiff responded by kicking him in the knee, and the detective pulled out a gun and pointed it at the plaintiff. <u>Id.</u> at *1. The plaintiff

was arrested based on the detective's report that the plaintiff pulled a knife on him; however, the charges were ultimately dismissed. Id. at *2. The court held that a reasonable jury could find that the detective "knowingly made a false report . . . in order to have the on-duty officers carry out his intent to have [p]laintiff falsely arrested" in order to conceal his altercation with the plaintiff. Id. Conversely, the record in this case does not contain any evidence that Contreras knowingly made a false statement to the NCPD, nor have Plaintiffs proffered any evidence that Contreras was motivated by a nefarious objective.

Plaintiffs fail to respond directly to the City Defendants' argument that Contreras did not instigate the arrest. (Pls.' City Defs.' Opp. Br. at 10-11.) Instead, Plaintiffs focus on Contreras' alleged failure to disclose to NCPD officers that Prioleau resisted his direction to stop fighting and assaulted him. (Pls.' City Defs.' Opp. Br. at 12.) Plaintiffs argue that by failing to disclose "omissions" or explain the "glaring discrepancies between his account and the other evidence," Contreras "implicated Plaintiffs as the aggressors despite compelling evidence to the contrary." (Pls.' City Defs.' Opp. Br. at 12.)

The Court acknowledges that Contreras' 32B Statement does not state that Contreras restrained Prioleau or that Prioleau attempted to assault Plaintiff. (See Contreras' 32B Stmt.)

However, the fact that Contreras restrained Prioleau to prevent him from leaving the Hess Station and Prioleau attempted to assault Contreras, (see Contreras' Dep. Tr., City Defs.' Mot. Ex. G, Docket Entry 56-7, 58:24-60:16), has no relevance to NCPD's investigation of the physical altercation between Iuzzolino, Knaust, and Prioleau. Parenthetically, Contreras testified that he did not want to press charges against Prioleau because "[h]e never physically punched me, he did--he was acting erratic and his arms were flailing because he didn't want to stop and relax." (Contreras' Dep. Tr. 60:9-16.)

The Court is also unpersuaded by Plaintiffs' apparent attempt to raise issues of fact based on "discrepancies between [Contreras'] account and the other evidence." (Pls.' City Defs.' Opp. Br. at 12.) Plaintiffs do not specify the "other evidence" that is arguably inconsistent with Contreras' account. (Pls.' City Defs.' Opp. Br. at 12.) To the extent Plaintiffs are alleging that discrepancies exist between the 911 call and Contreras' 32B Statement, they have failed to proffer a transcript or audio recording of the 911 call.[7] (See Pls.' City Defs.' Opp. Br. at 11-12 ("Contreras' recitation of the aggressor of the incident seems to make a [180] degree shift between his 'heat of the moment'

---

[7] The Court notes that the Complaint details a portion of the 911 call. (Compl. ¶ 32.) While the Complaint states that a "complete transcript" of the call is annexed at Exhibit A, no such Exhibit is attached to the Complaint. (See Compl. ¶ 32.)

excited utterance to 911 and witnesses and his more contemplative formal statements to Nassau County police officers thereafter").)

Moreover, even assuming, arguendo, that Contreras instigated Iuzzolino and Knaust's arrest, the Court finds that NCPD possessed probable cause. "Probable cause makes an arrest privileged and is a complete defense to Fourth Amendment claims of false arrest." See Fogelman v. Donato, 111 F. Supp. 3d 282, 285 (E.D.N.Y. 2015). Probable cause exists where the police officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." McNamara, 2009 WL 735135, at *5 (internal quotation marks and citation omitted). The question of whether an arrest was valid does not depend on the ultimate determination of guilt or innocence, and the Court only considers the information available to the arresting officer at the time of the arrest. Id.

"[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) (internal quotation marks and citation omitted; alteration in original). It is undisputed that Prioleau signed a supporting deposition attesting that he was "jumped" by

Iuzzolino and Knaust and they "knocked [him] down and slammed [his] head to the cement multiple times." (Prioleau 32B Stmt.) Officer Beyerlein testified that when she arrived on the scene, she observed Prioleau sitting on the ground bleeding; while the amount of blood was "nothing crazy," she testified that Prioleau "was injured and he had blood." (Beyerlein's Dep. Tr., Defs.' Mot. Ex. F, Docket Entry 56-6, 25:11-26:9.)

Plaintiffs have not proffered any evidence demonstrating that NCPD should have doubted Prioleau's veracity. Cf. DiStefano v. Sedita, No. 11-CV-1125, 2014 WL 349251, at *4 (E.D.N.Y. Jan. 31, 2014) ("[t]he most common situation in which such doubts [of veracity] arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation") (internal quotation marks and citation omitted). While Iuzzolino testified that he told NCPD that he was attacked, he did not cause Prioleau's injuries, and he wanted to press charges against Prioleau, (Iuzzolino's Dep. Tr., Defs.' Mot. at Ex. D, Docket Entry 56-4, 52:24-54:14), his protestations of innocence did not vitiate probable cause. Fogelman, 111 F. Supp. 3d at 285 ("[n]either an arrestee's protestations of innocence nor a putative victim's inconsistent statements necessarily vitiate probable cause"). See also Wieder v. City of N.Y., 569 F. App'x 28, 29 (2d Cir. 2014) ("[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to

explore and eliminate every theoretically plausible claim of innocence before making an arrest") (internal quotation marks and citation omitted).

Further, Officer Beyerlein testified that a pregnant woman she spoke with at the Hess Station said that Prioleau asked her for permission to fill his gas can in front of her, and "when [Prioleau] went over to the pump, [ ] two male whites started saying something to him and then a fight ensued and it even went into the back of her car." (Beyerlein's Dep. Tr. 27:11-22.) Officer Beyerlein testified that the pregnant woman also said that "[o]ne of the male whites made a comment . . . if you touch the pump you are going to have a problem." (Beyerlein's Dep. Tr. 27:19-28:3.) Officer Beyerlein also stated that she heard other people at the Hess Station "saying, in sum and substance, the victim was assaulted by two other people." (Beyerlein's Dep. Tr. 75:9-13.)

Thus, after reviewing the "totality of the circumstances," the Court finds that NCPD possessed probable cause to arrest Iuzzolino and Knaust. See DiStefano, 2014 WL 349251, at *4. Accordingly, the City Defendants' motion for summary judgment is GRANTED. The Court need not determine whether Contreras was entitled to qualified immunity. (See City Defs.' Br. at 23-25.)

II.  Hess' Motion

      As set forth above, the Court construes the Complaint as asserting claims for negligence and negligent infliction of emotional distress.  The Court will address each claim in turn.

    A.  Negligence

      Pursuant to New York law, the elements of a negligence claim consist of: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."  Gray v. Denny's Corp., 535 F. App'x 14, 15 (2d Cir. 2013) (internal quotation marks and citation omitted).  "Owners of public establishments have a duty to protect their patrons from reasonably foreseeable harm."  Cort v. Marshall's Dep't Store, No. 14-CV-7385, 2015 WL 9582426, at *4 (E.D.N.Y. Dec. 29, 2015).  However, this duty only arises where the premises owner "'has [the] opportunity to control such conduct, and is reasonably aware of the need for such control.'"  Id. (quoting Hegarty v. Tracy, 125 A.D.3d 804, 4 N.Y.S.3d 254, 255 (2d Dep't 2015)).  Accordingly, an owner does not have a duty to safeguard patrons from "unforeseeable assaults"; however, the defendant may be liable for an attack where it could have been anticipated or prevented.  Id.

      Hess concedes that as a landowner, it has a duty to prevent harm to patrons on its property, but argues that it "had no notice that would have made the subject altercation foreseeable,

and there was no duty to control the environment or implement rules to protect its patrons." (Hess' Br. at 9-10.) The Court disagrees.

Baig, the sales associate on duty at the time of the incident, testified that the line at the Hess station was half a mile long and it was "super busy" since other gas stations in the area were closed because they had no electricity. (Baig's Dep. Tr., Hess' Mot. Ex. D, Docket Entry 50-4, 14:2-7, 14:21-15:4.) He also testified that an African-American male told him that his car was stuck and he needed a gallon of gas, and Baig responded "'[t]here is a long line. Go to the line and request somebody if they allow.'" (Baig's Dep. Tr. 12:2-16, 42:3-9.) A reasonable juror could find that in the wake of Superstorm Sandy--when gasoline was scarce and the line at the Hess Station stretched half a mile long--it is foreseeable that customers waiting hours for gasoline could become unruly if an individual tried to cut the line, and Hess breached its duty of care when Baig suggested that Prioleau could cut the line if he obtained permission from a customer. Contrary to Hess' argument, the Court declines to find that Iuzzolino's testimony that the altercation was a "sudden event," (Iuzzolino's Dep. Tr., City Defs.' Mot. Ex. D, Docket Entry 56-4, 99:6-10), establishes a conclusive lack of foreseeability. (See Hess' Reply Br. at 4.)

While Hess attempts to analogize this case to <u>Millan v.</u> <u>AMF Bowling Ctrs., Inc.</u>, 38 A.D.3d 860, 861, 833 N.Y.S.2d 173, 174 (2d Dep't 2007), the Court is not persuaded. In <u>Millian</u>, the plaintiff brought a negligence claim after he was assaulted at a bowling alley owned by the defendant. <u>Millian</u>, 38 A.D.3d at 860. However, the plaintiff testified that prior to his assault, the assailant had only laughed at him, and the defendant's employee confirmed that the assailant had not caused earlier problems and the assault "happened suddenly and without warning." <u>Id.</u> at 861. The Court noted that "the owner of a public establishment has no duty to protect patrons against unforeseeable and unexpected assaults" and held that the plaintiff failed to raise triable issues of fact and "failed to demonstrate that the defendant's employees could reasonably have anticipated or prevented the assault of the plaintiff." <u>Id.</u> at 860-61.

While the Court acknowledges that Baig testified that this was the only incident that occurred while he was at the Hess Station on November 1st, (Baig's Dep. Tr. 28:19-29:2), Baig was aware of the long lines and extended wait for gas and a reasonable juror could find that he could have prevented the subject assault by not suggesting to Prioleau that he attempt to cut the line. Parenthetically, although Baig testified that he started his shift at "maybe four o'clock," (Baig's Dep. Tr. 11:17-18), Beyerlein testified that on that same date, she responded to the Hess Station

at 3:02 p.m. regarding "another disturbance," (Beyerlein's Dep. Tr. 17:20-18:6).

Hess characterizes the subject incident as a "sudden and spontaneous physical alteration" and essentially argues that Iuzzolino and Knaust's actions were a superseding cause absolving Hess of liability. (See Hess' Br. at 12 ("[p]laintiffs were the sole cause of this incident by aggressively attempting to prevent a third party from obtaining gas before them").) Pursuant to New York law, "where the plaintiff's intervening actions are not a normal and foreseeable consequence of the defendant's conduct, the plaintiff's conduct becomes a superseding cause which absolves the defendant of liability." Gray, 535 F. App'x at 17-18 (internal quotation marks and citation omitted). However, to be deemed a superseding cause, an intervening act must be "of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." Id. at 18 (internal quotation marks and citations omitted). Cf. Vetrone v. Ha Di Corp., 22 A.D.3d 835, 839, 803 N.Y.S.2d 156, 161 (2d Dep't 2005) ("intervening criminal acts may still give rise to liability under ordinary principles of negligence where there is a sufficient underlying legal relationship between the parties and where the acts are a reasonably foreseeable consequence of circumstances

created by the defendant") (internal quotation marks and citation omitted).

The Court finds that there are issues of fact as to whether Iuzzolino's actions in approaching Prioleau--or, for that matter, Prioleau's alleged conduct in starting the physical altercation--constitute intervening acts that break the chain of causation.  The Court cannot conclude as a matter of law that Iuzzolino's exchange with Prioleau and the physical altercation that followed were not a foreseeable consequence of Baig's suggestion to Prioleau that he obtain permission to cut the line. See Gray, 535 F. App'x at 18 (holding that there were issues of fact as to whether the plaintiff's conduct in asking loud and profane customers to be quiet after restaurant employees failed to do so was an intervening act with respect to her negligence claim based on her physical assault by those customers); Vetrone, 22 A.D.3d at 839-40 (holding that the assault upon the plaintiff when he tried to close the restaurant door on prepaid ticketholders was not, as a matter of law, an unforeseeable consequence of the defendants' conduct in "negligently overbooking the event and in then directing the unceremonious denial of admission to this large crowd of people who were there to attend a New Year's Eve party for which they had already paid").[8]

---

[8] Hess disputes the admissibility of evidence cited by Plaintiffs regarding Baig's alleged acceptance of the sum of $20.00 from

Hess also alleges that Plaintiffs have failed to show a causal link between their injuries and an alleged breach by Hess because Iuzzolino "testified that had he not been arrested, he would not have brought a lawsuit." (Hess' Reply Br. at 8.) However, Iuzzolino's admission that his arrest was the driving force in his decision to litigate these claims does not, in and of itself, break the chain of causation.

Finally, Hess argues that punitive damages are not warranted as Plaintiffs failed to demonstrate "'gross, wanton or willful' conduct." (Hess' Br. at 17.) "[P]unitive damages are not available for ordinary negligence." <u>Munoz v. Puretz</u>, 301 A.D.2d 382, 384, 753 N.Y.S.2d 463 (1st Dep't 2003). <u>See also Rey v. Park View Nursing Home, Inc.</u>, 262 A.D.2d 624, 627, 692 N.Y.S.2d 686 (2d Dep't 1999) ("Punitive damages are warranted where the conduct of the party being held liable evidences a high degree of moral culpability or where the conduct is so flagrant as to transcend mere carelessness or where the conduct constitutes willful or wanton negligence or recklessness") (citations omitted). To the extent Plaintiffs seek punitive damages in connection with their negligence claim against Hess, the Court finds that they have failed to raise triable issues of fact as to

---

Prioleau for one gallon of gas. (<u>See</u> Pls.' Hess Opp. Br. at 11; Hess' Reply Br. at 5-7.) The Court need not resolve this issue in light of its finding that other evidence in the record supports the denial of summary judgment on the negligence claim.

whether Hess' conduct rises above mere negligence to warrant an award of punitive damages. Accordingly, Hess' motion for summary judgment on the negligence claim is DENIED as to liability and GRANTED to the extent Plaintiffs seek punitive damages.

B. <u>Negligent Infliction of Emotional Distress</u>

"A claim for negligent infliction of emotional distress cannot be asserted if it is essentially duplicative of tort or contract causes of action." <u>C.T. v. Valley Stream Union Free Sch. Dist.</u>, 201 F. Supp. 3d 307, 327 (E.D.N.Y. 2016) (internal quotation marks and citation omitted) (holding that the plaintiff's negligent infliction of emotional distress claim was duplicative of his negligent supervision claim). <u>See</u> <u>also</u> <u>Virgil v. Darlak</u>, No. 10-CV-6479, 2013 WL 4015368, at *10 (W.D.N.Y. Aug. 6, 2013) (dismissing the negligent infliction of emotional distress claim where it was based on the same conduct underlying the medical malpractice claim).) Here, Plaintiffs' negligent infliction of emotional distress claim is duplicative of their negligence claim, as both claims are based on the same underlying conduct--Baig's suggestion to Prioleau that he seek permission to cut the line. (<u>See</u> Pls.' Hess Opp. Br. at 13 (stating, in their discussion of the negligent infliction of emotional distress claim, that "Plaintiffs' safety was unreasonably endangered by Baig's unilateral conduct, and the inextricable result caused Plaintiffs to rightfully fear for their safety"). Accordingly, Hess' motion

for summary judgment with respect to the negligent infliction of emotional distress claim is GRANTED.

<u>CONCLUSION</u>

For the foregoing reasons, Hess' motion for summary judgment (Docket Entry 49) is GRANTED IN PART and DENIED IN PART, and the City Defendants' Motion (Docket Entry 54) is GRANTED. Plaintiffs' remaining claim is against Hess for negligence. The Clerk of the Court is directed to TERMINATE Erik Contreras, New York City Police Department, and the City of New York as defendants in this action. The Clerk of the Court is further directed to TERMINATE Therese Iuzzolino and Elizabeth Knaust in her individual capacity as plaintiffs in this action in light of the Court's dismissal of the loss of society claim.

The remaining parties are directed to file a joint proposed pre-trial order that complies with the Individual Rules of this Part on or before September 25, 2017, and appear for a pre-trial conference before the undersigned on October 25, 2017 at 2:30 p.m.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      August __23__, 2017
            Central Islip, New York